ACCEPTED
13-14-00566-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
2/27/2015 5:28:12 PM
DORIAN RAMIREZ
CLERK

NO. 13-14-00566-CV

IN THE COURT OF APPEALS OF TEXAS
THIRTEENTH APPELLATE DISTRICT
AT CORPUS CHRISTI

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
2/27/2015 5:28:12 PM
DORIAN E. RAMIREZ
Clerk

\*\*\*\*\*

**PENSION ADVISORY GROUP, INC.
AND PAUL D. HINSON**

**v.**

**FIDELITY SECURITY LIFE INS. CO.
AND DAVID SMITH**

\*\*\*\*\*

# Brief of Appellees
# Fidelity Security Life Ins. Co. and David Smith

\*\*\*\*\*

On Appeal from the 343rd Judicial District Court
of Aransas County, Texas
Trial Court Cause No. A-12-0179-CV-C

\*\*\*\*\*

Gene R. Besen
State Bar No. 24045491
Dentons US LLP
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
Email: gene.besen@dentons.com

*Lead counsel for all appellees*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT OF THE CASE................................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................................2

ISSUES PRESENTED..........................................................................................3

STATEMENT OF FACTS ....................................................................................4

     I.     Introduction: This case arises from Fidelity explaining to CJA why Fidelity sought the return of $337,000 in commissions from CJA.......4

     II.    Hinson sold a Fidelity annuity to Renfro's company Star Consultants.. ......................................................................................................6

          A.  Hinson acted as a subcontractor of CJA. .......................................6

          B.  Hinson requested a $200,000 commission for selling an annuity to Renfro's company..................................................................7

          C.  Hinson sent Renfro a blank commission disclosure notice but claims that Renfro signed it nonetheless. ......................................8

     III.   After Renfro's lawyer Welch investigated the sale of the annuity, Fidelity honored Renfro's request to cancel the annuity. ...................11

          A.  Welch learned about the commission and asked Hinson to produce the commission disclosure notice. ...............................11

          B.  Even Hinson agrees that what purports to be Renfro's signature is not a genuine signature. .............................................................14

          C.  Welch brought her concerns to Fidelity.......................................15

          D.  Fidelity honored Renfro's request to cancel the annuity contract.... ..................................................................................................17

          E.  Fidelity informed CJA that Fidelity would be charging back commissions and explained why. ...............................................19

          F.  Hinson learned of the reasons from CJA, which eventually demanded that Hinson return his commission.............................23

     IV.   Hinson filed suit, and others learned of the allegations from Hinson's suit. ...........................................................................................24

V.      The trial court granted a take-nothing summary judgment on Hinson's and his agency Pension Advisory Group's claims against Fidelity and Smith..................................................................................25

SUMMARY OF THE ARGUMENT ......................................................27

ARGUMENT ...........................................................................................29

I.      Standard of Review. ..........................................................29

II.     Business Disparagement and Defamation............................30

        A.  Fidelity acted without malice......................................31

            1.  The record shows that Fidelity did not act with malice, and Hinson offered no evidence of malice. ...................................32

            2.  Malice is proven by evidence establishing the subjective intent of the parties..........................................................35

        B.  Any statements made by Fidelity were privileged. ......................37

        C.  Hinson did not present sufficient evidence of damages to avoid summary judgment. .......................................................40

            1.  Hinson had no economic damages..........................................41

            2.  Hinson is not entitled to presumed damages. ...........................44

        D.  The record demonstrated that Hinson suffered no damages from any statements made by Fidelity.............................................46

            1.  The record established that Hinson's relationship with CJA has not changed. ...........................................................46

            2.  The record established that any other alleged lost business cannot be tied to any alleged statements of Fidelity.................47

III.    Tortious Interference with Existing and Prospective Contracts .........51

        A.  These claims are based on the allegedly defamatory statements which are protected by the qualified privilege. ...........................53

        B.  Hinson failed to produce any evidence of existing contracts subject to interference...............................................54

        C.  Hinson failed to offer evidence of prospective business relationships subject to interference, or that Fidelity knew of or intentionally interfered with any relationships. ...........................56

ii

      D.   Hinson failed to provide sufficient evidence of any damages......58

      E.   Hinson waived arguments both at the trial court and on appeal...58

      F.   The record evidence showed that Fidelity did not engage in any tortious conduct..................................................................................61

  IV.   Conspiracy..............................................................................................61

  V.   Fiduciary Duty.......................................................................................64

  VI.   Evidentiary Motions..............................................................................67

      A.   Hinson has made no showing of harm relating to the exclusion of experts or summary judgment evidence. ......................................67

      B.   Hinson fails to prove that the trial court abused its discretion by excluding the expert testimony of James Ferguson and Stuart Wright. .............................................................................................68

         1.   Neither Ferguson nor Wright have qualified expert opinions on alleged damages suffered by Hinson. ......................................69

         2.   Neither Ferguson nor Wright have qualified expert opinions on Appellees' conduct.................................................................72

      C.   Hinson fails to prove that the trial court abused its discretion by striking Hinson's summary judgment evidence. ..........................74

CONCLUSION AND PRAYER FOR RELIEF........................................................76

CERTIFICATE OF WORD-COUNT COMPLIANCE ...........................................78

CERTIFICATE OF SERVICE................................................................................79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Intl.*,
134 S.Ct. 2347 (2014)..................................................................................43

*Allen v. City of Baytown*,
No. 01-09-014-CV, 2011 WL 3820963 (Tex. App.—Houston [1st
Dist.] Aug. 25, 2011, no pet.) .................................................................37

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.*,
223 S.W.3d 616 (Tex. App.—Fort Worth 2007, pet. denied)....................52, 58

*Austin v. Inet Techs.*,
118 S.W.3d 491 (Tex. App.—Dallas 2003, no pet.) .........................................50

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002)............................................................................32

*Bird v. W.C.W.*,
868 S.W.2d 767 (Tex. 1994) .........................................................................54

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001)............................................................................56

*Burbage v. Burbage*,
447 S.W.3d 249 (Tex. 2014) ..........................................................43, 44, 45

*Carr v. Weiss*,
984 S.W.2d 753 (Tex. App.—Amarillo 1999, pet. denied) .............................65

*Casteel v. Crown Life Ins. Co.*,
3 S.W.3d 582 (Tex. App.—Austin 1997, rev'd on other grounds,
22 S.W.3d 378 (Tex. 2000)) ....................................................................64

*City of Houston v. Clear Creek Basin Authority*,
589 S.W.2d 671 (Tex. 1979) ....................................................................55, 60

*City of San Antonio v. Pollock*,
284 S.W.3d 809 (Tex. 2009) .........................................................................43

iv

*Crim. Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,
   823 S.W.2d 591 (Tex. 1992) ..................................................................65

*Dolcefino v. Turner*,
   987 S.W.2d 100 (Tex. App. —Houston [14th Dist] 1998, rehearing
   overruled)..............................................................................................36

*Doncaster v. Hernaiz*,
   161 S.W.3d 594 (Tex. App.—San Antonio 2005, no pet.) ...............................68

*E.R. Dupuis Concrete Co. v. Penn Mut. Life Ins. Co.*,
   137 S.W.3d 311 (Tex. App—Beaumont 2004, no pet.)....................................65

*Firestone Steel Prods. v. Barajas*,
   927 S.W.2d 608 (Tex. 1996) ..................................................................62

*Forbes Inc. v. Granada Biosciences Inc.*,
   124 S.W.3d 167 (Tex. 2003) ...............................................................30, 31, 34

*Gaines v. CUNA Mut. Ins. Soc.*,
   681 F.2d 982, 985 (5th Cir. 1982) ...............................................................32, 33

*Garcia v. Lucero*,
   366 S.W.3d 275 (Tex. App. – El Paso 2012, no pet.) .......................................41

*Gonzales v. Levi Strauss & Co.*,
   70 S.W.3d 278 (Tex. App.—San Antonio 2002, no pet.) ...............................50

*Hancock v. Variyam*,
   400 S.W.3d 59 (Tex. 2013)...............................................................40, 44, 45

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989)..............................................................................36

*Hearst Corp. v. Skeen*,
   159 S.W.3d 633 (Tex. 2005) ..................................................................32

*Hill v. Heritage Res,. Inc.*,
   964 S.W.2d 89 (Tex. App.—El Paso 1997, pet. denied)..................................56

*Ho v. Univ. of Texas at Arlington*,
   984 S.W.2d 672 (Tex. App.—Amarillo 1998, pet. denied) ...............................74

*Hoss v. Alardin*,
338 S.W.3d 635 (Tex. App. – Dallas 2011, no pet.) ..........................................43

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
749 S.W.2d at 762, 766 (Tex. 1987)..........................................................*passim*

*K-Mart Corp. v. Honeycutt*,
24 S.W.3d 357 (Tex. 2000)................................................................................73

*Kaplan v. Goodfried*,
497 S.W.2d 101 (Tex. Civ. App.—Dallas 1973, no writ)................................39

*Kellmann v. Workstation Integrations Inc.*,
332 S.W.3d 678 (Tex. App.—Houston [14th Dist.] 2010, no pet.) .41, 43, 44, 70

*KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*,
988 S.W.2d 746 (Tex. 1999) ............................................................................30

*Krishnan v. Law Office of Preston Henrishson*,
83 S.W.3d 295 (Tex. App.—Corpus Christi 2002, pet. denied) ..................54, 74

*Lee v. Hasson*,
286 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).................65

*Mack Trucks, Inc. v. Tamez*,
206 S.W.3d 572 (Tex. 2006) .............................................................................68

*Maxwell v. Willis*,
316 S.W.3d 680 (Tex. App.—Eastland 2010, no pet.).......................................74

*MBM Fin. Corp. v. Woodlands Operating Co, L.P.*,
292 S.W.3d 660 (Tex. 2009) .............................................................................45

*McCarthy v. Padre Beach Homes, Inc.*,
No. 13-01-846-CV, 2003 WL 22025858 (Tex. App.—Corpus
Christi Aug. 19, 2003, no pet.) .........................................................................68

*McConnell v. Southside I.S.D.*,
858 S.W.2d 337 (Tex. 1993) .............................................................................38

*Meyer v. Cathey*,
167 S.W.3d 327 (Tex. 2005) ........................................................................64, 65

*Morgan Stanley & Co. v. Texas Oil Co.*,
  958 S.W.2d 178 (Tex. 1997) ...................................................................58

*Nat'l City Bank v. Ortiz*,
  401 S.W.3d 867 (Tex. App.—Houston [14th Dist.] 2013, pet.
  denied)........................................................................................................38

*Nath v. Texas Children's Hospital*,
  446 S.W.3d 355, 370 (Tex. 2014). ..........................................................53

*National Am. Ins. Co. v. Thompson*,
  No. 06-00-00111-CV, 2001 WL 521913 (Tex. App.—Texarkana
  May 17, 2001, pet. denied) ......................................................................65

*Owens-Corning Fiberglas Corp. v. Malone*,
  972 S.W.2d 35 (Tex. 1998)......................................................................74

*Peshak v. Greer*,
  13 S.W.3d 421 (Tex. App.—Corpus Christi 2000, no pet.) ........................30, 40

*Procter & Gamble Mfg. Co. v. Hagler*,
  880 S.W.2d 123, 125 (Tex. App.—Texarkana 1994, writ denied) ....................33

*Provident Life and Acc. Ins. Co. v. Knott*,
  128 S.W.3d 211 (Tex. 2003) ....................................................................29

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*,
  29 S.W.3d 74 (Tex. 2000)....................................................................52, 58

*Rangel v. Progressive County Mut. Ins. Co.*,
  333 S.W.3d 265 (Tex. App.—El Paso 2010, review denied)..........................59

*Riley v. Zuber*,
  No. 01-98-01180-CV, 2001 WL 59325 (Tex. App.—Houston [1st
  Dist.] 2001, no pet.) .................................................................................51

*Rincones v. WHM Custom Services*,
  No. 13-11-00075-CV, 2015 WL 602016 (Tex. App.—Corpus
  Christi Feb. 12, 2015, no pet.) ............................................................50, 51

*Rizkallah v. Conner*,
  952 S.W.2d 580 (Tex. App.—Houston [1st Dist.] 1997, no pet.)................54, 74

*Salinas v. Salinas*,
365 S.W.3d 318 (Tex. 2012) (per curiam) ........................................................44

*San Antonio Credit Union v. O'Connor*,
115 S.W.3d 82 (Tex. App.—San Antonio 2003, pet. denied)............................37

*Tesoro Petrol. Corp. v. Nabors Drilling USA Inc.*,
106 S.W.3d 118, 128 (Tex. App. – Houston [1st Dist.] 2002, pet.
denied)...............................................................................................................39

*Tex. Dep't of Transp. v. Able*,
35 S.W.3d 608 (Tex. 2000)................................................................................67

*Tex. Div.-Tranter v. Carrozza*,
*876 S.W.2d 312, 314 (Tex. 1994)*......................................................................54

*Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts,
Inc.*,
300 S.W.3d 348 (Tex. App.—Dallas 2009, pet. denied)..............................29, 61

*Texaco, Inc. v. Pennzoil, Co.*,
729 S.W.2d 768 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd
n.r.e.) .................................................................................................................75

*Texaco Inc. v. Phan*,
137 S.W.3d 763 (Tex. App.—Houston [1st Dist.] 2004, no pet.)......................41

*Tri v. J.T.T.*,
162 S.W.3d 552 (Tex. 2005) ..................................................................61, 62, 63

*TRT Development Co.-KC v. Meyers*,
15 S.W.3d 281 (Tex. App.—Corpus Christi 2000, no pet.) ..............................39

*Valadez v. Avitia*,
238 S.W.3d 843, 845 (Tex. App. – El Paso 2007, no pet.) ...............................47

*Vargas v. Vargas*,
No. 13-07-159-CV, 2008 WL 2293262 (Tex. App. – Corpus
Christi June 5, 2008, no pet.)............................................................................38

*Vaughn v. Drennon*,
372 S.W.3d 726, 740 (Tex. App.—Tyler 2012, no pet.)...................................45

*Western Steel Co. v. Altenburg*,
   206 S.W.3d 121 (Tex. 2006) .............................................................30

*Wheeler v. Methodist Hosp.*,
   95 S.W.3d 628 (Tex. App.--Houston [1st Dist.] 2002, no writ).........................50

*Wohlstein v. Aliezer*,
   321 S.W.3d 765 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ...................62

**Statutes**

Tex. R. App. P. 38.1(i)...................................................................38

Tex. R. App. P. 44.1.....................................................................67

Tex. R. Civ. P. 166a(i). ................................................................29, 30

## STATEMENT OF THE CASE

Appellants Paul Hinson and Pension Advisory Group (collectively "Hinson") sued appellees Fidelity Life Ins. Co. and David Smith (collectively "Fidelity"), as well as Frank Renfro ("Renfro"), Star Consultants, Inc., and Star Defined Benefit Plan & Trust (collectively "Star"). The suit arose from Renfro and Star's decision to cancel an annuity sold by Hinson and issued by Fidelity. Hinson alleged business disparagement, defamation, tortious interference with existing and prospective contracts, conspiracy, breach of contract, and fraud. *C.R. 1:19*.

The trial court (Hon. Janna Whatley, 343rd District Court, Aransas County) granted Fidelity and Smith's traditional and no-evidence motions for summary judgment. *C.R. 2:859, 862*. Previously, Renfro and Star had been dismissed from this suit. *See Appx.* 16 (copy requested for inclusion in supplemental clerk's record).

The judgment of the trial court became final when Fidelity non-suited its counter-claim against Hinson. *C.R. 2:859, 862*.

Hinson filed his notice of appeal on Sept. 29, 2014. *C.R. 2:863*.

1

## STATEMENT REGARDING ORAL ARGUMENT

The Court should deny oral argument. The facts and law are straightforward and are adequately described in this brief. Although appellants Paul Hinson and Pension Advisory Group attempt to create fact issues, their purported fact issues are neither genuine nor material. Oral argument, therefore, would not aid the Court's decisional process.

# ISSUES PRESENTED

The following issues are presented by this appeal:

1. Did the trial court err in granting Fidelity's motions for summary judgment?

2. Did the trial court abuse its discretion in sustaining Fidelity's objections to the testimony of Hinson's expert witnesses?

3. Did the trial court abuse its discretion in sustaining Fidelity's objections to certain of Hinson's summary judgment evidence?

## STATEMENT OF FACTS

**I.     Introduction: This case arises from Fidelity explaining to CJA why Fidelity sought the return of $337,000 in commissions from CJA.**

Paul Hinson was asking Frank Renfro to sign a disclosure-of-commissions notice more than a year after Renfro applied to purchase an annuity for his company's pension plan. *See below*, at 13.  Hinson claimed that he had a copy of the notice with Renfro's signature but was too busy to look for the document. *See below*, at 14.  Hinson eventually produced a notice that purported to bear Renfro's signature, but Renfro and his lawyer, Deborah Welch, denied that the signature was genuine. *See below*, at 16.  They sent Fidelity evidence that Renfro was out of town on the date shown on the notice. *See below*, at 16.  Renfro and Welch demanded the cancellation of the annuity and a return of all premiums and loads. *See below*, at 15-16.[1]

---

[1] Except as expressly indicated or where the context requires a different construction, references in this brief to plaintiff/appellant Paul D. Hinson are references to both that party and to co-plaintiff/co-appellant Pension Advisory Group, Inc. Additionally, except as expressly indicated or where the context requires a different construction, references in this brief to defendant/appellee Fidelity are references to both that party and to co-defendant/co-appellee David Smith.  The arguments in this brief pertain to both plaintiffs/appellants.

Fidelity honored that demand. *See below*, at 17. The annuity contract required Fidelity to terminate the annuity at the customer's request. *Id.* Fidelity then exercised a contractual right to recover commissions from CJA & Associates Inc. ("CJA"), which had recruited Hinson as an agent to sell Fidelity's products. *See below*, at 19.

Fidelity sought reimbursement of $337,000 in commissions. Fidelity's general counsel Martha Madden and two other Fidelity employees told CJA of Renfro's complaint and about the disclosure notice to explain why the Annuity was terminated and commissions clawed back. *See below*, at 19-20.

Hinson and his agency Pension Advisory Group Inc. then sued Fidelity, its vice-president David Smith, Renfro, Renfro's company Star Consultants, and the company's pension plan. (Third Am. Pet.). Renfro and Star Consultants were dismissed by agreement of the parties. *See Appx.* 16 (copy to be included in supplemental clerk's record). Hinson and Pension Advisory Group appeal from a summary judgment in favor of Fidelity and Smith. *C.R. 2:833, 858.*

**II.    Hinson sold a Fidelity annuity to Renfro's company Star Consultants.**

**A.    Hinson acted as a subcontractor of CJA.**

Fidelity has a "Marketing Services Agreement" with insurance marketing company CJA. *C.R. 2:129* (Ankner depo. 7-8), *142* (Bleiweis depo. 27), *301* (agmt.). Under that agreement, CJA is to recruit, train, subcontract with, and manage agents to sell Fidelity's insurance products. *C.R. 2:302-303* (§1(G))*, 308* (§2). In return, CJA receives commissions and administrative fees and drives business to its own actuarial and plan administration business. *C.R. 2:161* (Tashma depo. 17), *309* (Art. VIII).

CJA requested that Fidelity appoint Hinson to sell Fidelity's products, and Fidelity did so. *C.R. 2:113* (Hinson depo. 156), *297, 300* (application for and e-mail requesting appointment). Hinson had a commission agreement with CJA, and he received his commissions for selling Fidelity products under that agreement. *C.R. 2:115* (Hinson depo. 161-164), *147* (Bleiweis depo. 70-71), 442 (agmt.). CJA received all the commissions, and Fidelity never made any commission payment to Hinson. *C.R. 2:115* (Hinson depo. 161-163). This arrangement was consistent with the Marketing Services Agreement, which provided that CJA's subcontractors (such as Hinson) "shall look solely to CJA for payment of any

6

compensation or allowances due as a result of their appointment, except as specified by separate agreement between the Insurer [Fidelity] and the subcontractor." *C.R. 2:308* (§2); *see also C.R. 2:115* (Hinson depo. 161-163).

**B.     Hinson requested a $200,000 commission for selling an annuity to Renfro's company.**

Frank Renfro, on behalf of his company Star Consultants, consulted with Hinson about an overfunding issue affecting Star Consultants' defined-benefit pension plan. *C.R. 2:124* (Hinson depo. 218-219), *176* (Renfro depo. 57), *238-239* (Evenson depo. 32-35). Hinson advised Renfro to create a "412(e)(3) plan" to address the issue. *C.R. 2:124* (Hinson depo. 219). Hinson contacted CJA, touted their plans, and discussed Renfro's situation with CJA vice-president George Evenson. *C.R. 2:124* (Hinson depo. 219), *239* (Evenson depo. 33-35). Evenson recommended the purchase of an annuity from Fidelity. *Id.*

During that discussion, Hinson requested a $200,000 commission. *C.R. 2:243* (Evenson depo. 87-88). Hinson, however, opined that Renfro had no business knowing what commission Hinson received from CJA. *C.R. 2:106* (Hinson depo. 97-99). For example, the following exchange occurred during Hinson's testimony:

7

Q. So is the answer yes, I do acknowledge that it's important for all my clients to know what I'm going to charge them for my services?

A. Either you have a hearing impairment or you did not understand my answer. The answer is absolutely quantitatively no.

*Id.*[2]

Fidelity, however, required that Renfro and Hinson each sign a commission disclosure notice (the "Disclosure Notice"), *C.R. 2:336* (CJA's application instructions), *344* (Fidelity form).

## C.     Hinson sent Renfro a blank commission disclosure notice but claims that Renfro signed it nonetheless.

CJA sent Hinson an application package that contained the forms necessary to obtain the Fidelity annuity for the 412(e)(3) plan. *C.R. 2:92* (Hinson depo. 142-143), *235* (Evenson depo. 10-12), *330-331* (e-mails). Hinson forwarded the forms to Renfro two days later. *Id.* The forms included the Disclosure Notice, but Hinson did not complete the Disclosure Notice with information about his commission because, he claims, "I had no earthly idea what my commission would be on this one." *C.R. 2:92* (Hinson depo. 143-144). Hinson expected Renfro to sign a blank form

---

[2] Hinson admits that Renfro had alternatives to having his company's pension plan purchase an annuity that would yield Hinson a large commission. *Appellants' brief*, at 1 ("Hinson proposed three solutions"); *see also C.R. 2:218-219* (Hinson depo. 218-219).

8

because, Hinson said, "the commission is irrelevant, immaterial to the fact of what we accomplished in doing this plan." *C.R. 2:93* (Hinson depo. 145).

On March 23, 2011, Renfro's assistant Pam Nicholson ("Nicholson) sent an e-mail in which she told Hinson's assistant Susan Jamison ("Jamison"):

> Frank [Renfro] and I filled out what we could with pencil. There was so much that was left blank, we thought it best that once all the information was put together, it could be typed in one setting. … If there is ANY other info that I can get, please email and let me know.

*C.R. 2:358* (e-mail, emph. in orig.); *see also C.R. 2:247* (Nicholson depo. 51-52). The next day, Nicholson returned the application forms to Hinson. *C.R. 2:247* (Nicholson depo. 49-52). The forms included a "totally and completely blank" Disclosure Notice. *Id.* Hinson, however, claims that he received a Disclosure Notice with Renfro's signature. *C.R. 2:79-80* (Hinson depo. 51-53).

On receiving the forms, Jamison forwarded them to CJA. *C.R. 2:77* (Hinson depo. 37-40). While three pages had typed information, a fourth – the Disclosure Notice – was entirely handwritten. *C.R. 2:90* (Hinson depo. 134-135), *369-372, 459-460* (forms). Two different copies of the signed Disclosure Notice were produced. Hinson claimed that he sent CJA a copy ("Exhibit 7A") with no date and that erroneously stated a commission for a

9

group term life insurance policy. *C.R. 2:459* (form); *see also C.R. 2:90-92* (Hinson depo. 135-141). Fidelity, however, had a dated copy that identified Renfro as plan fiduciary, employer, and trustee, and that identified the commission for an annuity. *C.R. 2:460* (form); *see also C.R. 2:90-92* (Hinson depo. 135-141), *149-152* (Bleiweis depo. 87-101), *C.R. 2:366, 372* (Madden letter and form).

CJA's standard practice was to review each application for accuracy and completeness before submitting the application to the insurer. *C.R. 2:160* (Tashma depo. 10-12). When an application was incomplete, CJA would return the application to the agent or, if "innocuous information" were omitted, CJA would obtain the agent's consent to remedy the omission. *Id*. Here, however, CJA had nothing to indicate that it either returned the application or contacted Hinson about any omission. *C.R. 2:164* (Tashma depo. 37-40).

CJA submitted the application that it received from Hinson to Fidelity. *C.R. 2:149-150* (Bleiweis depo. 86-89). CJA's general counsel Jeff Bleiweis and vice-president Doug Tashma had no explanation for why Hinson claimed to send CJA a copy of the Disclosure Notice that differed from the copy that Fidelity claimed to receive from CJA. *C.R. 2:150, 152* (Bleiweis depo. 89, 101), *162-164* (Tashma depo. 29-32, 37-38).

10

After receiving the application, Fidelity issued an annuity contract between itself and Star Consultants' pension plan. *C.R. 2:373* (contract). Under the annuity's terms, Fidelity deducted an approximately $300,000 load from the premiums that Star Consultants paid. *C.R. 2:239-240* (Evenson depo. 36-37), *229* (Madden depo. 117-118). The load was an amount selected by CJA and Hinson deducted from the annuity's cash value to cover administrative expenses, including commissions. *C.R. 2:230* (Madden depo. 121).

Fidelity paid approximately $337,000 in commissions to CJA. *C.R. 2:134* (Ankner depo. 90). From that sum, CJA paid approximately $200,000 in commissions to Hinson's agency Pension Advisory Group. *Id.; C.R. 2:169* (Tashma depo. 75-76).

**III. After Renfro's lawyer Welch investigated the sale of the annuity, Fidelity honored Renfro's request to cancel the annuity.**

**A. Welch learned about the commission and asked Hinson to produce the commission disclosure notice.**

In early 2012, Renfro asked lawyer Deborah Welch ("Welch") to review his estate planning. *C.R. 2:177* (Renfro depo. 113-114), *197* (Welch depo. 19). As part of this process, Welch wanted to know more about the 412(e)(3) plan. *C.R. 2:198, 200* (Welch depo. 41, 43, 66). Renfro had expressed concern to Welch about the lack of accountings and unanswered

11

questions after transferring over $4 million of money from Star Consultants' pension plan to purchase the annuity. *C.R. 2:199* (Welch depo. 47).

Welch and Renfro's CPA, Lewis Meers, began contacting CJA and Hinson about the 412(e)(3) plan and the annuity purchase. *C.R. 2:79-80* (Hinson depo. 52-56), *198* (Welch depo 43-44), *241* (Evenson depo. 50-51). Welch asked about the $300,000 load. *C.R. 2:201* (Welch depo. 69-70). In a March 22, 2012, e-mail, Hinson responded that the load included his commission. *Id.* According to Renfro and Welch, before they received that e-mail, neither knew that the transaction included a commission. *Id.; C.R. 2:180* (Renfro depo. 185-188). Renfro specifically denied that Hinson told him about receiving a commission on the sale of the annuity. *C.R. 2:180* (Renfro depo. 185).

In the e-mail, Hinson also denied receiving any commission on any principal amount over $1 million because he "did not feel it was justified." *C.R. 2:180* (Renfro depo. 187). That statement was false. *C.R. 2:135* (Ankner depo. 101-103), *241* (Evenson depo. 50-51). When questioned in his deposition about the statement, Hinson admitted, "I received commission on over a million dollars." *C.R. 2:89* (Hinson depo. 130-131). But Hinson would not admit that he lied, instead claiming that he had "no

12

earthly idea how to calculate this commission," even though an "[a]pproximately 5 percent commission" on $1 million was far less than the $203,000 that he actually received. *Id.*

As Welch continued her work, she made numerous requests to Hinson about the 412(e)(3) plan and the annuity. *C.R. 2:201-202* (Welch depo. 73-74). This included requesting that Hinson provide the application documents for the annuity. *Id.* Hinson offered excuses, such as his secretary forgetting to send them and his secretary having a nervous breakdown. *Id.* He characterized Welch's requests as "a pain in the ass." *C.R. 2:107* (Hinson depo. 110-111).

A May 17, 2012, e-mail from Welch specifically requested a copy of the completed Disclosure Notice. *C.R. 2:99-100, 108* (Hinson depo. 56-57, 116), *202* (Welch depo. 73-75). A completed copy of the notice was not in Renfro's files. *C.R. 2:179* (Renfro depo. 183-184); *202, 210* (Welch depo. 74-75, 113-116).

Hinson did not immediately respond to Welch's May 17 e-mail. *Id.* Instead, about one hour later, Hinson had his assistant Janet Rhodes send an e-mail that asked Renfro to sign a Disclosure Notice. *C.R. 2:382-383* (e-mail and form); *see also C.R. 2:99-100* (Hinson depo. 56-57), *202-203* (Welch depo. 75-77). Rhodes did not copy Welch as a recipient of the e-

mail. *Id.* When Renfro did not respond, Rhodes sent a second e-mail on May 21, 2012. *C.R. 2:387* (e-mail and form); *see also C.R. 2:100* (Hinson depo. 57). According to Hinson, he had a copy of the original signed Disclosure Notice, but he wanted Renfro to sign another Disclosure Notice because Welch was "hounding" him, because Hinson "had more clients" and was not going to "drop everything … to go pull the files," because he "did not have time to respond to" Welch's request, and because he wanted to get Welch "off my ass, okay." *C.R. 2:100, 108* (Hinson depo. 57, 116). Hinson claims that he told Renfro to get Welch "off my back" and that, "[b]efore this is over, Deborah Welch will know more about you than your girlfriend knows about your anatomy." *C.R. 2:107* (Hinson depo. 111).

Welch testified that she never received a signed Disclosure Notice from Hinson. *C.R. 2:210* (Welch depo. 113-114, 116).

## B.     Even Hinson agrees that what purports to be Renfro's signature is not a genuine signature.

As noted below, at 15, Renfro claims he never signed a Disclosure Notice, and the copy of the Disclosure Notice that Hinson claims to have received from Renfro ("Exhibit 7A") differed from the Disclosure Notice ("Exhibit 8A") that CJA sent to Fidelity.

Hinson acknowledges that Exhibit 7A does not actually bear Renfro's signature. The following exchanges occurred during Hinson's testimony:

> Q. … It appears from that sentence [in the original petition] that initially you believed that Frank Renfro's signature was not a forgery, but now we've learned that it indeed was a forgery, true?
>
> A. True.
>
> Q. … Again, now we know that it was a forgery, right?
> A. We know it was a forgery. What we don't know is whether Mr. Renfro instructed someone to execute that document.

*C.R. 2:88* (Hinson depo. 126-127).

Renfro's secretary, Pam Nicholson, denied signing the Disclosure Notice and testified that she returned a blank Disclosure Notice to Hinson. *C.R. 2:247* (Nicholson depo. 49-52). Renfro also denied ever signing or authorizing someone to sign the notice. *C.R. 2:179* (Renfro depo. 183-184).

### C.     Welch brought her concerns to Fidelity.

After learning of Hinson's May 17, 2012, e-mail asking Renfro to sign a new Disclosure Statement, Welch contacted Fidelity's general counsel Martha Madden. *C.R. 2:204* (Welch depo. 82-83); *221* (Madden depo. 71).  Welch asked that Fidelity cancel the annuity because Hinson had not disclosed his commission at the time of sale. *Id.*  Welch also mentioned Hinson's request that Renfro sign a new Disclosure Statement and asked

that Fidelity also return all premium payments and loads with interest. *C.R. 2:204* (Welch depo. 82-83).

Madden responded in a May 30, 2012, letter. *C.R. 2:366* (letter). Her letter said that Fidelity would not refund the load, and said, "For both Mr. Hinson and Mr. Renfro, it appears they had not recalled that a disclosure statement had been executed by Mr. Renfro at the time of the application on January 15, 2011." *Id.* Madden attached to the letter a copy of the application forms, including the Disclosure Notice that was in Fidelity's administrative file. *C.R. 2:204-205* (Welch depo. 83-86), 230 (Madden depo. 123), *369-372* (forms). Madden's letter was the first time that either Welch or Renfro saw a Disclosure Notice that supposedly had, but did not actually have, Renfro's signature. *C.R. 2:182* (Renfro depo. 199-200).

Welch discussed the Disclosure Notice with Renfro and then told Madden that Renfro's signature was not genuine. *C.R. 2:183* (Renfro depo. 201-203), 205 (Welch depo. 85-86), 231 (Madden depo. 125). Welch also provided Madden with documentation from Renfro to show that he was out of town on January 15, 2011, the date shown on Fidelity's copy of the Disclosure Notice. *C.R. 2:184* (Renfro depo. 208), *206* (Welch depo. 90-91), *231* (Madden depo. 126).

**D. Fidelity honored Renfro's request to cancel the annuity contract.**

Fidelity was now faced with: (1) a customer, represented by counsel, requesting the return of all premiums and loads and denying that he had signed the Disclosure Notice (*see above*, at 15-16); (2) an agent who refused or was unable to produce a copy of the executed Disclosure Notice to the customer's attorney (*see above*, at 13); (3) that agent was attempting to obtain an executed Disclosure Notice from the customer more than a year after the application and only after an inquiry from the customer's attorney (*see above*, at 13); and (4) evidence that the client was out of town on the date shown on the Disclosure Notice (*see above*, at 16).

The parties agree that Fidelity had a contractual obligation to cancel the annuity at the customer's request. *C.R. 2:122* (Hinson depo. 209-210), 378 (termination clause). Hinson's own contract with CJA provided that an annuity could be canceled pursuant to its terms. *C.R. 2:117* (Hinson depo. 169-170), *443* (§3.1(c) of contract).

Because Fidelity had a contractual duty to return the value of the annuity, Fidelity's only decision was whether to return the premiums and loads. *C.R. 2:232* (Madden depo. 130-131). Faced with the facts identified

17

above, Fidelity decided to honor that part of Renfro's demand and return the premiums and loads as well. *Id.*

In exchange, Fidelity sought a release from any liability arising from the sale of the annuity. *C.R. 2:207* (Welch depo. 95-96), *223* (Madden depo. 81-82). To best protect Fidelity, Madden wanted a release of everyone involved in the sale of the annuity, including Hinson, his agency, and CJA. *C.R. 2:223* (Madden depo. 81-82). Welch and Madden negotiated the terms of the release. *C.R. 2:207-208* (Welch depo. 95-100), 225 (Madden depo. 89). Welch requested language that would preserve claims against Hinson and his agency that were not connected to the sale of the annuity. *Id.* Although Madden had not suggested any such carve-out, she accommodated the request. *Id.*

The release was executed on July 2, 2012, and the money was returned to Star Consultants' plan the same day. *C.R. 2:178* (Renfro depo. 164), *389* (release). The release protected not only Fidelity, but also CJA, Hinson, Hinson's agency Pension Advisory Group, and others from liability arising from the sale of the annuity. *C.R. 2:390* (release). As Welch had requested, the release excluded claims against Hinson and Pension Advisory Group "for any tax planning, tax preparation, estate planning and

18

any other services … as long as any such claim is unrelated to any FSL [Fidelity] product … ." *C.R. 2:393* (release).

Fidelity did not confer with Hinson before agreeing to return the premiums and loads. *C.R. 2:79* (Hinson depo. 49-52), *222, 223* (Madden depo. 78, 82). Hinson faults Fidelity for not doing so – even though Hinson had evaded Welch's request for the Disclosure Notice, *see above*, at 13-14, went behind her back to solicit a new Disclosure Notice from Renfro, *see above*, at 13, and admits that Renfro was right about not signing the Disclosure Notice, *see above*, at 15.

## E. Fidelity informed CJA that Fidelity would be charging back commissions and explained why.

On June 29, 2012, Fidelity's general counsel Madden sent an e-mail to CJA's general counsel Bleiweis. *C.R. 2:144* (Bleiweis depo. 53-54), *225* (Madden depo. 92), *420* (e-mail). The e-mail explained:

> FSL [Fidelity] has been requested to return all monies on the Star Group Consultants (Frank Renfro) with accumulated interest. There is an additional request that all loads be waived.
>
> This request has been made based upon the following: 1) the failure to disclose commissions; and the 2) failure to obtain appropriate documentation regarding the transaction. From FSL's [Fidelity's] standpoint, such failures would arise under CJA's requirement to supervise the soliciting agent.

*C.R. 2:420* (e-mail). The e-mail added that "[d]ue to the cancellation or voiding" of the annuity, Fidelity "will be charging back commissions." *Id.* The e-mail relayed Renfro's representations but did not allege forgery. *Id.* Bleiweis did not see the e-mail until returning from vacation. *C.R. 2:144* (Bleiweis depo. 53-54).

Shortly after Madden sent the e-mail, and also on June 29, 2012, Fidelity vice-president David Smith called CJA president Ray Ankner to inform him that Fidelity would be charging back commissions. *C.R. 2:131* (Ankner depo. 22-24), *280* (Smith depo 35-36), *461* (e-mail about the call). Ankner characterized the conversation as "heated … all across the board," and Smith said that Ankner was "incredibly acrimonious." *Id.* Ankner told Smith that he wanted "a hold harmless" because he believed Fidelity's action "was damaging to the client and potentially setting us all up for liability." *C.R. 2:131* (Ankner depo. 23-24). Smith responded that Fidelity had obtained a release. *Id.*

Ankner testified that, according to Smith, "part of the reason was because Paul Hinson had forged some documents." *C.R. 2:131* (Ankner depo. 22-23). Ankner sent an e-mail to his company's general counsel Bleiweis and vice-presidents Tashma and Evenson about the call. *C.R. 2:461* (e-mail). Ankner's e-mail mentioned his demand for a release but did

20

not mention the forgery allegation or any other allegation about Hinson. *Id.* Ankner's e-mail mentioned that he "totally disagreed" with Fidelity's decisions, including to charge back the $337,000 in commissions paid to CJA. *Id.; see also C.R. 2:134* (Ankner depo. 90).

Ankner did not have any other conversation with Smith about the authenticity of Renfro's signature. *C.R. 2:133* (Ankner depo. 73). Ankner only shared the allegations during Smith's call with Bleiweis, and he never communicated the allegations to anyone outside CJA. *C.R. 2:133, 136* (Ankner depo. 74-76, 109). Ankner did not believe the allegations, the allegations did not affect his willingness to do business with Hinson, and his company CJA continued to do business with Hinson "without exception." *C.R. 2:136* (Ankner depo. 109-110).

On July 2, 2012, Tashma spoke with Fidelity employee Terrence O'Malley ("O'Malley"), who responded that Renfro claimed that he did not actually sign the documents. *C.R. 2:166* (Tashma depo. 63-64). O'Malley did not take a position on the authenticity of the signature. *Id.* After the conversation, Tashma sent an e-mail that does not document any defamatory statement by O'Malley and that expresses CJA's "displeasure" with Fidelity. *C.R. 2:409* (e-mail). Tashma never discussed any forgery

allegation with anyone outside CJA, except for Hinson. *C.R. 2:170* (Tashma depo. 79-80).

After Bleiweis returned from vacation, he and Madden spoke about Fidelity's decisions regarding the annuity and the commissions. *C.R. 2:227* (Madden depo. 97-100). Madden told Bleiweis of Renfro's allegations that Hinson did not disclose commissions and that Renfro had not signed the Disclosure Notice. *Id.* Bleiweis disagreed with Fidelity's decisions, and Madden explained that Fidelity had "a he-said/she-said situation, a factual dispute, between an insured and an agent" and that because the annuity contract was "between FSL [Fidelity] and the contract owner, … it is Fidelity's decision on whether to enter into a settlement with its contract owner." *Id.* As for Bleiweis' concern that the settlement would cause "overfunding or tax issues," Madden responded that Renfro and Star Consultants "were represented by two separate counsel regarding those issues … ." *Id.* Madden also explained that, under the Marketing Services Agreement, Fidelity had the right to charge back commissions. *Id.*[3]

---

[3] The Marketing Services Agreement contains this provision: "When contributions are refunded within five years of the first premium deposit because the Annuity is Cancelled, or is Void with no legal effect, then the Insurer will chargeback all commissions." *C.R. 2:326.*

Madden had compared the signatures on the application documents, and according to Bleiweis, Madden told him that Fidelity believed that the signature on the Disclosure Notice was forged. *C.R. 2:146* (Bleiweis depo. 65), *228* (Madden depo. 102).

Bleiweis did not have any conversations with anyone outside CJA, aside from Hinson, about Fidelity's decision to return the money to Star Consultants' pension plan. *C.R. 2:153* (Bleiweis depo. 106-107).

**F.    Hinson learned of the reasons from CJA, which eventually demanded that Hinson return his commission.**

Tashma spoke by telephone with Hinson, and, according to Hinson, Tashma said that Fidelity had accused Hinson of forging the Disclosure Notice.  C.R. 2:81 (Hinson depo. 75)  Tashma told Hinson that CJA was going to charge back Hinson's commission. *Id.*

Hinson also had conversations with Ankner and Bleiweis about the matter. *C.R. 2:110-111* (Hinson depo. 128-129). Hinson's knowledge of any allegedly defamatory allegations is based solely on information provided by CJA's Tashma, Ankner, and Bleiweis. *Id.; see also C.R. 2:81* (Hinson depo. 75-76). Those witnesses never shared or repeated the allegations to anyone other than Hinson. *C.R. 2:133, 136* (Ankner depo. 74-76, 109), *153* (Bleiweis depo. 106-107), *170* (Tashma depo. 79-80).

In December 2012, CJA notified Hinson that it would charge back the commissions that Hinson received in connection with selling the Fidelity annuity to Star Consultants' pension plan. *C.R. 2:169-170* (Tashma depo. 73, 75-78), *452* (letter).

## IV. Hinson filed suit, and others learned of the allegations from Hinson's suit.

Hinson and his agency Pension Advisory Group filed suit on August 8, 2012, against Renfro, Star Consultants, the Star Consultants pension plan, Fidelity, and Smith. *(original petition requested for inclusion in supplemental clerk's record).*

Hinson and his lawyer told Hinson's friend and accountant, Stuart Wright ("Wright"), about the allegations. *C.R. 2:291-292* (Wright depo. 4, 10). Wright has no other personal knowledge about any facts related to Hinson's suit. *Id.*

James Ferguson ("Ferguson") is a friend of Hinson and shares clients with him. *C.R. 2:256* (Ferguson depo. 10). Ferguson first learned of the suit from Renfro's accountant Louis Meers, who told Ferguson that there was a suit between Hinson and Renfro. *C.R. 2:255* (Ferguson depo. 7-8). Ferguson did not know who sued whom but was aware of an allegation that Hinson had forged a signature. *Id.* Aside from Meers, Hinson, and Hinson's

24

lawyer, Ferguson has not heard about the allegations from anyone and has no other knowledge of the facts of the suit. *C.R. 2:256-258* (Ferguson depo. 12-13, 16-17).

Meers testified that he never heard anyone at Fidelity accuse Hinson of forgery. C.*R. 2:265* (Meers depo. 29). Meers learned of Renfro's statement that the signature was not his from Renfro and Welch. *C.R. 2:263, 264* (Meers depo. 13-14; 18-19).

## V. The trial court granted a take-nothing summary judgment on Hinson's and his agency Pension Advisory Group's claims against Fidelity and Smith.

Fidelity and Smith filed a no-evidence motion for summary judgment and a traditional motion for summary judgment on Jan. 21, 2014. *C.R. 2:3, 15*. On March 21, 2014, the trial court appointed a master in chancery to resolve and make recommendations to the trial court on all pre-trial matters. *C.R. 2:831*. On June 27, 2014, the trial court accepted the recommendations of the Master in Chancery and signed an order memorializing her rulings granting summary judgment on all of Hinson's claims in favor of Fidelity and Smith, as well as Fidelity's motion to strike Hinson's summary judgment evidence and motion to exclude Hinson's expert testimony. *C.R. 2:833*. On August 25, 2014, the trial court, after

considering the objections of Hinson to the earlier order, affirmed her order of June 27, 2014.  *C.R. 2:858.*

The judgment of the trial court became final when Fidelity non-suited its counter-claim against Hinson.  *C.R. 2:859, 862.*  Hinson filed his notice of appeal on Sept. 29, 2014.  *C.R. 2:863.*

## SUMMARY OF THE ARGUMENT

Hinson cannot prevail on any of his claims. The business disparagement and defamation claims fail because there was no evidence of malice and the communications were protected by the qualified privilege. *See below*, at 31-40. Additionally, Hinson failed to establish that he suffered any damages, *see below*, at 40-45, much less any damages that can be tied to any alleged statement of Fidelity. *See below*, at 46 -51.

The tortious interference with contract claims also fail because Hinson failed to establish neither any contracts or prospective relationships that were subject to interference, *see below*, at 54-58, nor any damages. *See below*, at 58. Additionally, the tortious interference claims rely solely on the allegedly defamatory statements, which are protected by the qualified privilege. *See below*, at 53-54.

The conspiracy claim fails because Hinson has failed to establish that Fidelity conspired with any third party for a wrongful purpose, *see below*, at 61-64, and the fiduciary duty claim fails because Fidelity did not owe any duty to Hinson. *See below*, at 64-67.

Hinson failed to make any showing that the evidentiary rulings he appeals resulted in any harm. *See below*, at 67-68. Moreover, the trial court did not abuse its discretion in excluding Hinson's expert witnesses because

they had no expert opinion to offer, *see below*, at 68-72, and in excluding

certain of Hinson's summary judgment evidence that was hearsay and

conclusory. *See below*, at 72-76.

Accordingly, the Court must affirm the trial court's judgment.

## ARGUMENT

### I.  Standard of Review.

Fidelity made two motions for summary judgment, *C.R. 2:3, 15*, and the trial court granted both motions. *C.R. 2:833.*  Because the trial court did not limit its ruling to particular grounds, Hinson must show that the trial court's summary judgment cannot stand on any of the grounds that Fidelity presented.  *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

Texas civil procedure recognizes two types of summary judgment grounds – "traditional" and "no-evidence."  To determine how to classify a particular ground, a court must look to the substance of the ground and not the title of the motion.  *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 375 (Tex. App.—Dallas 2009, pet. denied).  For example, if a motion labeled as "traditional" contains a ground asserting that the nonmovant has "no evidence" of an element of a claim, a court must treat that ground as a no-evidence ground and subject Rule 166a(i). *Tex. Integrated*, 300 S.W.3d at 375.

A "court must grant" a no-evidence motion for summary judgment "unless the respondent produces summary judgment evidence raising a genuine issue of material fact" as to each challenged element of a claim.

Tex. R. Civ. P. 166a(i). A traditional summary judgment is upheld if "the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law." *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).[4]

## II.   Business Disparagement and Defamation

For a claim of defamation, a plaintiff must prove: (1) the defendant published a statement of fact; (2) the statement referred to the plaintiff; and (3) the statement was defamatory. *Peshak v. Greer*, 13 S.W.3d 421, 426 (Tex. App.—Corpus Christi 2000, no pet.). The plaintiff must also show he was damaged by the statement. *Id.* Common law privilege is a defense to defamation. *Id.*

"To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Biosciences Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). While the two torts are similar, "defamation

---

[4] Hinson has not challenged the summary judgment for Fidelity on his claims for fraud and breach of contract. Thus, these portions of the judgment must be affirmed. *Western Steel Co. v. Altenburg*, 206 S.W.3d 121, 124 (Tex. 2006).

actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests." *Id.*

The trial court properly granted summary judgment for Fidelity on these claims because (1) there was no evidence of malice, thus defeating an element of the business disparagement claim and establishing the qualified privilege for defamation; (2) Hinson did not present sufficient evidence of damages to avoid summary judgment; and (3) the record establishes that Hinson did not suffer damages from any of the alleged statements of Fidelity.

### A. Fidelity acted without malice.

In response to the no-evidence motion on business disparagement, Hinson was required to provide more than a scintilla of evidence that Fidelity acted with actual malice, that is actual knowledge of the falsity or reckless disregard as to the truth of the statements, or with an ill will or intent to interfere with Hinson's economic interest. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d at 762, 766 (Tex. 1987). Malice therefore presents a matter of the defendant's subjective knowledge and intent.

**1.** **The record shows that Fidelity did not act with malice, and Hinson offered no evidence of malice.**

To show malice, Hinson primarily attacks the thoroughness of Fidelity's investigation. Hinson also argues that Fidelity's failure to consider evidence that was not known to Fidelity is evidence of malice.

A "failure to investigate fully" does not establish malice. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005). Courts instead look for "a purposeful avoidance of the truth" to show malice. *Id.* Even a "mere failure to investigate the facts, by itself, is no evidence of actual malice." *Bentley v. Bunton*, 94 S.W.3d 561, 595 (Tex. 2002). "Mere negligence is not enough. There must be evidence that the defendant in fact entertained serious doubts as to the truth of his publication, evidence that the defendant actually had a high degree of awareness of … the probable falsity of his statements." *Id.* at 591.

Hinson argues that lack of care, avoidance of key witnesses, and refusal to consider other possibilities are evidence of malice, but that argument is contrary to Texas law and the evidence in this case. In *Gaines v. CUNA Mut. Ins. Soc.*, a former insurance agent sued his former employer for defamation stemming from a letter from the employer's vice president to various company officials. 681 F.2d 982, 985 (5th Cir. 1982) (applying

32

Texas law). The insurance agent argued that a failure to "telephone him to discuss the problem before sending the letter constitute[d] evidence of actual malice." *Id.* at 988. The court, however, held that the failure to investigate the truth of a privileged communication did not by itself constitute evidence of malice, and was not inconsistent with the defendant employer's good faith so as to justify an inference of malice. *Id.*

Not only is speaking with a person accused of improper conduct not necessary, often any such conversation is not relevant. For example, in *Procter & Gamble Mfg. Co. v. Hagler*, an employee had no evidence of his employer's actual malice in publishing the employee's termination for theft on a bulletin board, even though the employer listened to the employee's side of the story. 880 S.W.2d 123, 125 (Tex. App.—Texarkana 1994, writ denied). In light of other facts, a person investigating an event may have good reason to reject foreseeable denials and excuses from an accused – and thus it would not matter whether or not he spoke with the accused.

This is one of those cases. In addition to Renfro's denial and information that he was out of town on the day that he purportedly signed the Disclosure Notice, Fidelity also knew that Hinson was belatedly trying to get Renfro to sign a new Disclosure Notice, and that Hinson went behind the back of Renfro's lawyer Welch to do so. *See above*, at 13-14. Martha

33

Madden also compared the signatures, and even Hinson agrees that Renfro did not sign the Disclosure Notice. *See above*, at 15. If Fidelity had investigated further, Hinson's denial of responsibility and accusation that Nicholson signed Renfro's name would be countered with Nicholson's and Renfro's denial of that accusation, Hinson's belief that his commission was not something that Renfro needed to know, and an e-mail in which Hinson either lied about his commission or made a statement about his commission when he had "no earthly idea" whether the statement was true. *See above*, at 8. Even attempting to figure in the potential bias of the witnesses leaves reason to doubt Hinson: while Renfro sought to recover the value of the annuity and $300,000 in loads, Hinson sought to keep a $200,000 commission and evaded the efforts of Renfro's lawyer to obtain documents reflecting more about that commission. *See above*, at 13.

The question of malice "focuses on the defendant's state of mind at the time of the publication." *Forbes*, 124 S.W.3d at 173. Any "evidence" is irrelevant to a finding of malice unless Fidelity knew of the evidence when it acted. For example, Hinson's background in the insurance industry and purported reputation for honesty is not probative without evidence that

Fidelity knew about that background and reputation.[5]  Hinson also points to

the testimony of the expert witnesses, Susan Abbey and John Weldon, but

that testimony did not exist when Fidelity made the alleged statements and

therefore is not probative of malice.  Hinson also suggests, without citation,

that Renfro's secretary, Nicholson, signed Renfro's name.  But there is no

evidence that Fidelity was aware of the possibility that Nicholson

occasionally signed documents for Renfro.

Hinson also argues that additional "factors" must be considered, but

Hinson did not provide record citations to support their existence.  Hinson's

conclusory statements about those "factors" must be disregarded.

### 2.    Malice is proven by evidence establishing the subjective intent of the parties.

The question of malice—whether via evidence of knowledge or

reckless disregard of falsity, ill will, or an intent to interfere with the

Hinson's economic interest—is a question of Fidelity's subjective intent.

Contrary to Hinson's argument, courts do not use a "checklist" to determine

---

[5] The law also recognizes that such character evidence has limited utility, *see, e.g.,* Fed. R. Evid. 404, Adv. Comm. Note.  Even if FSL knew the number of years that Hinson has sold insurance or the amount he received for the creation of a single insurance product, neither would be evidence that the alleged statement was so improbable as to suggest malice on the part of Fidelity.

the existence of malice. While circumstantial evidence may be considered, the evidence "must be sufficient to permit the conclusion that the defendant entertained doubts as to the truth of his publication." *Dolcefino v. Turner*, 987 S.W.2d 100, 111 (Tex. App. —Houston [14th Dist] 1998, rehearing overruled). "Mere surmise or suspicion of malice does not carry the probative force necessary to form the basis of a legal inference of malice." *Id*. at 12. While "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence … courts must be careful not to place too much reliance on such factors." *Id*. at 111, n. 13 (discussing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)). For example, *Dolcefino* rejected the plaintiff's attempt to establish malice by complaining of the thoroughness of the defendant's investigation, noting that a failure to investigate is not evidence of malice. *Id*. at 118.

Hinson identified no opinion using his approach of a checklist of cobbled-together factors, cherry-picked from a number of cases. Such an approach departs from established law that simply focuses on whether the evidence is legally sufficient to permit a reasonable inference that a defendant acted with malice.

## B.    Any statements made by Fidelity were privileged.

A defendant is entitled to a common-law qualified privilege if the statements were (1) made without actual malice; (2) concern a subject matter that is of sufficient interest to the author or is in reference to a duty the author owes; and (3) communicated to another party having a corresponding interest or duty. *San Antonio Credit Union v. O'Connor,* 115 S.W.3d 82, 99 (Tex. App.—San Antonio 2003, pet. denied).

The alleged statements of Smith and Madden were privileged because there was no malice, *see above*, at 31-36, the alleged statements were within Fidelity's interest (as Fidelity issued the annuity that Renfro sought to cancel and refund), *see above*, at 11, and were of interest to CJA, who was asked to return more than $300,000 in commissions that it shared with Hinson. *See above*, at 19-23.

Hinson questions whether privilege was properly before the trial court. Fidelity's motion for summary judgment, however, did raise the issue of privilege, and even though privilege was discussed in a footnote, *C.R. 2:40*, that was sufficient to raise the matter as a summary judgment ground. *Allen v. City of Baytown*, No. 01-09-014-CV, 2011 WL 3820963, *7 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, no pet.) (alternative summary judgment ground was adequately presented via a footnote). The footnote

contained argument, case and record citations, and stated a reason why Hinson could not prevail on a defamation claim. *C.R. 2:40.* For Hinson to complain that grounds were unclear, he had an obligation to specially except to Fidelity's motion. *McConnell v. Southside I.S.D.*, 858 S.W.2d 337, 342-343 (Tex. 1993). Instead, Hinson fully argued the privilege issue, and did not object even when Fidelity further agued privilege in its summary judgment reply. *See Nat'l City Bank v. Ortiz*, 401 S.W.3d 867, 901 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("summary-judgment grounds may be stated concisely, without detail and argument"); *see also C.R. 2:698-700* (reply).

Hinson argues that summary judgment was improper because: (1) the communication to CJA was not within CJA's interest, (2) Fidelity did not prove the communication was for the purpose of the privilege, and (3) Fidelity exceeded the scope of the privilege. *Appellants' Brief*, at 31-32.

Hinson's first two contentions are conclusory, lack any supporting legal citation, and are therefore waived. *Id.* at 31. "An appellant waives an issue if he fails to support contentions by citations to appropriate authority." *Vargas v. Vargas*, No. 13-07-159-CV, 2008 WL 2293262, *1 (Tex. App. – Corpus Christi June 5, 2008, no pet.); *see also* Tex. R. App. P. 38.1(i). An appellate also waives an issue if he fails to provide "such discussion of the

38

facts and the authorities relied upon as may be requisite to maintain the point at issue." *Tesoro Petrol. Corp. v. Nabors Drilling USA Inc.*, 106 S.W.3d 118, 128 (Tex. App. – Houston [1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations[,]" *id.*, as Hinson has done here.

Notwithstanding that waiver, Hinson's first two contentions lack merit. Statements are privileged "if the relationship between the parties is such that it is within generally accepted standards of decent conduct to furnish the information for the protection of the recipient." *TRT Development Co.-KC v. Meyers*, 15 S.W.3d 281 (Tex. App.—Corpus Christi 2000, no pet.) (citations omitted). Courts have warned against defining the privilege so narrowly as to include only statements that are "strictly necessary," which is exactly what Hinson is trying to do. *Kaplan v. Goodfried*, 497 S.W.2d 101, 106 (Tex. Civ. App.—Dallas 1973, no writ) (receptionist's statement was privileged even though she could have taken the patient's history without making the statement). The record amply shows that the cancellation of the annuity, the subsequent request for the return of the commissions, and how reports of Hinson's conduct affected those decisions, were of interest to CJA, which had to refund its commission (including the part that it paid to Hinson) and which itself

39

sought a release after cancellation of the annuity. *See above*, at 19-23. All of the statements identified by Hinson as the basis of his claim were privileged. Fidelity had no obligation to negate facts or scenarios that Hinson did not allege and that lack support in the record. Because the statements were privileged, the trial court correctly granted summary judgment on Hinson's defamation claim.

### C. Hinson did not present sufficient evidence of damages to avoid summary judgment.

Three categories of damages are available for defamation: nominal, actual or compensatory, and exemplary damages. *Hancock v. Variyam,* 400 S.W.3d 59, 65 (Tex. 2013). Actual or compensatory damages include both general damages, such as mental anguish and injury to the reputation, which are non-economic, as well as special damages, including lost earning capacity, which must be specifically stated and proven. *Hancock*, 400 S.W.3d at 65; *Peshak,* 13 S.W.3d at 426. Only special damages are available for business disparagement. To show special damages, the plaintiff must "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." *Hurlbut*, 749 S.W.2d at 767.

### 1.     Hinson had no economic damages.

Economic damages must be quantified. Hinson, however, "made no attempt to quantify h[is] damages in the trial court. Therefore, [he] failed to raise a fact issue on this element." *Garcia v. Lucero*, 366 S.W.3d 275, 279 (Tex. App. – El Paso 2012, no pet.).

Although Hinson sought lost profit damages, *C.R. 1:31-32*, "[l]ost profit estimates or opinions must be based on objective facts, figures, or data from which the lost profits amount may be ascertained." *Kellmann v. Workstation Integrations Inc.*, 332 S.W.3d 678, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "To be recoverable, lost profits must be proven by competent evidence with reasonable certainty." *Texaco Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Kellmann*, 332 S.W.3d at 684.

Hinson's attempts to show lost profits fail because his allegations of loss were speculative. For example, Hinson testified that he has not received calls about new business from Texas' Panhandle Region, *C.R. 2:85* (Hinson depo. 113-114), but even assuming that Hinson once had substantial business from that region, such a statement is not evidence of

the "realized or liquidated loss" required for a showing of special damages. *Hurlbut*, 749 S.W.2d at 767. Similarly, Hinson alleged that he lost referrals from Wright, but Wright was unable to identify a single piece of business that Hinson did not receive because of any allegation of forgery. *C.R. 2:294* (Wright depo. 27). Although Hinson has cited his anticipation of the potential loss of Betty Samota as a client, she has not changed insurance agents. *C.R. 2:86* (Hinson depo. 118-119). Hinson himself described these losses as "hypothetical." *C.R. 2:87* (Hinson depo. 122-123).

Hinson also alleged that a pension disability product he developed was worth $8 million but is now worthless as a result of the forgery allegations. Hinson identified Ferguson and Wright as expert witnesses who would testify as to this loss. The testimony of both, however, proves that this alleged loss is speculative, and there is no record evidence to show that this alleged loss has been realized or liquidated. Wright has no knowledge as to whether the product developed by Hinson is going to be successful, regardless of the allegations in the lawsuit. *C.R. 2:294* (Wright depo. 26). Ferguson testified that he does not have any knowledge as to whether the product is worth $8 million or whether it will ever be worth anything. *C.R. 2:259* (Ferguson depo. 34-35). Moreover, any evidence of the product's value is based on conclusory statements, which are

42

"incompetent evidence" – and therefore "legally insufficient evidence" – even when no objection was made in the trial court. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (quoted, citing additional cases). Hinson produced no basis for the alleged valuation of the product, and such an opinion without a supporting basis is conclusory. *Id.* at 816-818 (discussing, with examples); *see also Burbage v. Burbage*, 447 S.W.3d 249, 260 (Tex. 2014) (there must be a concrete basis for any estimate of financial value).[6]

Another fatal defect of Hinson's economic damage claims is that Hinson did not provide any "net profits" evidence. "The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits." *Kellmann*, 332 S.W.3d at 684. Where a plaintiff's lost profits evidence fails to account for all expenses, the plaintiff has no evidence of such damages. *See, e.g., Hoss v. Alardin*, 338 S.W.3d 635, 654-655 (Tex.

---

[6] Contradicting Hinson's contentions about the supposedly worthless pension disability product is that he continues work on the product, including with a trustee, insurance carrier, and underwriter. *C.R. 2:112* (Hinson depo. 138-139). Although Hinson "filed for a patent on that product," *C.R. 2:100* (Hinson depo. 100), he has not shown that he actually has a patent on the product or that any such patent is not subject to invalidation. *See Alice Corp. Pty. Ltd. v. CLS Bank Intl.*, 134 S.Ct. 2347, 2355-2357 (2014) (describing "abstract idea" inventions, including investment methods, that were not patentable).

App. – Dallas 2011, no pet.) (affirming no-evidence motion for summary judgment, citing similar cases); *Kellmann*, 332 S.W.3d at 684-688 (reversing damage award and rendering take-nothing judgment, citing similar cases). Even assuming that Hinson had evidence of such matters as lost commissions and lost profits, his evidence remains legally insufficient because he has not shown the corresponding expenses.[7]

## 2. Hinson is not entitled to presumed damages.

Defamation per se actions allow the jury to presume the existence of general damages when the communication at issue is not public or when the plaintiff proves malice. *Hancock*, 400 S.W.3d at 65-66. The Texas Supreme Court has recently made clear, however, that "this presumption yields only nominal damages." *Burbage*, 447 S.W.3d at 259 (citations omitted). "Beyond nominal damages, we review presumed damages for evidentiary support." *Id.* That is, "even if a statement is defamatory per se, "the law does not presume any particular amount of damages beyond nominal damages." *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) (per curiam) (holding that even if a statement is defamatory per se, "the law

---

[7] Hinson's own testimony suggests that those expenses are substantial: "[S]ome years I can lose a half a million dollars." *C.R. 2:108* (Hinson depo. 114).

does not presume any particular amount of damages beyond nominal damages"); *Hancock*, 400 S.W.3d at 66 ("Awards of presumed actual damages are subject to appellate review for evidentiary support.").

Even if nominal damages were appropriate here, appellate courts may not reverse only to allow the recovery of nominal damages. *Burbage*, 447 S.W.3d at 263 (reversing jury award of damages and rendering take nothing judgment instead of remanding for award of nominal damages); *MBM Fin. Corp. v. Woodlands Operating Co, L.P., 292 S.W.3d 660, 666 (Tex. 2009) (noting rule). Moreover, Hinson failed to preserve any nominal damage claim by not requesting nominal damages in the trial court. *See Vaughn v. Drennon*, 372 S.W.3d 726, 740 (Tex. App.—Tyler 2012, no pet.) (finding waiver by failing to request nominal damages in trial court and also noting no-reversal-for-nominal-damages rule); *C.R. 1:19* (Third Am. Pet.).

Moreover, there should be no presumption of nominal damages because there is no evidence Fidelity acted with malice, *see above*, at 31-37, and there is no evidence or allegation of any public statement. *Hancock*, at 65-66.

**D. The record demonstrated that Hinson suffered no damages from any statements made by Fidelity.**

The trial court properly granted summary judgment to Fidelity because the evidence demonstrated that Hinson did not suffer any damages as a result of the statements Madden and Smith allegedly made to Ankner and Bleiweis. *C.R. 2:455* (interrogatory answer); *C.R. 2:119* (Hinson depo. 194); *C.R. 2:413* (interrogatory answer).

**1. The record established that Hinson's relationship with CJA has not changed.**

Hinson continues to do business with CJA, the entity to whom the alleged statements were made. Ankner does not believe that Hinson forged Renfro's name, and the alleged statements did not affect his willingness to do business with Hinson. *See above*, at 21. Hinson continues to do business with CJA. *C.R. 2:84* (Hinson depo. 110-111). Hinson has not shown that he suffered any damages that can be tied to his relationship with CJA.

Hinson's brief only cites to his own deposition testimony, which confirms only the existence of an agreement to repay CJA – and not, as Hinson claims – that CJA refuses to do business with Hinson. *Appellants' Brief*, at 13, *citing C.R. 2:568* (Hinson depo. 171-172). Hinson nonetheless waived that contention because he made no attempt to provide the Court with any analysis of how the cited-to deposition testimony demonstrates

that summary judgment was improper. *See, e.g., Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App. – El Paso 2007, no pet.) (briefing requirements are "not satisfied by merely uttering brief conclusory statements unsupported by legal citations").

Moreover, even if Hinson had established a lack of current business with CJA, that alone would not have allowed him to survive summary judgment because Hinson has failed to even make an argument, let alone proffer evidence, that any action of Fidelity is responsible for the alleged lack of business with CJA. Loss of future business must be proximately caused by the allegedly defamatory statements. *Hurlbut*, 749 S.W.2d at 767 (the defamatory statement "must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss of trade or other dealings, is established"). Hinson has failed to show that any allegedly defamatory statements caused him a loss of CJA's business.

**2.    The record established that any other alleged lost business cannot be tied to any alleged statements of Fidelity.**

Hinson's attempt to claim that his relationships with others suffered as a result of any statement of Fidelity was properly rejected by the trial court because the record evidence demonstrated that CJA did not republish the

47

alleged statements. Both Ankner and Bleiweis testified that they did not discuss their conversations with Smith and Madden with anyone outside of CJA and Hinson. *See above*, at 21, 23. Similarly Tashma testified that he has not discussed any allegations of forgery with anyone outside of CJA. *See above,* at 21-22.[8] Because the alleged statements were not republished by CJA, any alleged loss of business cannot be the result of any statements by Fidelity or Smith.[9]

Moreover, the trial court properly rejected Hinson's claim that he suffered damages as the result of lost business with Ferguson and Wright as the testimony of both demonstrated that any alleged damages are the result of the statements and actions of Hinson. Hinson alleges that he has lost business from Ferguson. *C.R. 1:29* (Third Am. Pet. ¶50); *87* (Hinson depo. 122-123). Ferguson testified, however, that he told Hinson he was not going to send him any business until he resolved the lawsuit with Renfro.

---

[8] Ankner, Bleiweis, and Tashma were the only CJA employees that were identified as trial witnesses by Hinson. *C.R. 2:421-440* (witness designation).

[9] Hinson alleged that Meers, Renfro's CPA, "further spread the allegations of forgery against Hinson to Ferguson at a conference in 2012." *C.R. 1:28* (Third Am. Pet. ¶45). First, both Meers and Ferguson testified that Meers told Ferguson about the allegations of the lawsuit *brought by Hinson*. *See above*, at 24-25. Second, any statements made by Meers cannot be tied to FSL. Meers testified that he never heard FSL state that Hinson forged the disclosure notice, and that he learned of Renfro's statement that the signature was not his from Renfro and Welch. *See above*, at 25.

*C.R. 2:256* (Ferguson depo. 10). More significantly, Ferguson testified that he has no independent knowledge of the underlying forgery allegations and that all of his knowledge regarding this case came from Meers who told him about this lawsuit filed by Hinson, and from Hinson and his counsel. *See above*, at 24-25. He testified that he has not heard anything else relating to the forgery allegations from anyone in his industry, and that he had no independent knowledge of whether there has even been a forgery allegation. *Id.*

Similarly, Hinson alleged that he has lost referrals from Wright, but Wright testified that he has no personal knowledge of the allegations in this lawsuit, and everything he knows about the allegations was told to him by Hinson and his attorney. *See above*, at 24. Again, Wright's testimony demonstrates that any decision he made with regard to sending referrals to Hinson cannot be tied to the alleged statements made by Fidelity but are instead because of the statements of Hinson and his decision to file this lawsuit.

Hinson also alleged that he has lost referrals from Meers and Welch. *C.R. 1:29* (Third Am. Pet. ¶50). However, both of them have testified that they never heard anyone at Fidelity accuse Hinson of forgery. *See above*, at 25; *C.R. 2:205* (Welch depo. 88). Yet again, the record shows that any

action taken by Meers or Welch cannot be tied to any statements made by Fidelity or Smith.

Finally, Hinson alleged that Fidelity is liable for any alleged damages Hinson has suffered because he chose to file this lawsuit and tell others about it. *Appellants' Brief* at 11. Although the general rule is that a defendant is not liable for the unauthorized repetition of defamatory statements by a third party, *Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 639-40 (Tex. App.–Houston [1st Dist.] 2002, no writ), an exception for the doctrine of self-publication has been recognized by several Texas Courts of Appeals. *Rincones v. WHM Custom Services*, No. 13-11-00075-CV, 2015 WL 602016 (Tex. App.—Corpus Christi Feb. 12, 2015, no pet.). Under *Rincones*, a party can be liable for another's self-publication if the plaintiff is compelled to publish the statement. *Id*. at *14-15.[10]

---

[10] As noted by this Court in *Rincones*, there is a split in the Courts of Appeal, with the majority requiring that a plaintiff also demonstrate lack of knowledge of the defamatory nature of the statement in order to recover for self-publication. *Rincones*, 2015 WL 60216 at *15; *compare with Austin v. Inet Techs*., 118 S.W.3d 491, 499 (Tex. App.—Dallas 2003, no pet.); *Gonzales v. Levi Strauss & Co*., 70 S.W.3d 278, 283 (Tex. App.—San Antonio 2002, no pet.). Under this majority test, Hinson's claim would fail as he has steadfastly maintained that any defamatory statements made by Fidelity were false.

Hinson's argument is that it is proper to file a lawsuit for defamation without sustaining or identifying any damages, and then argue that he has been damaged as a result of his own discussions of the lawsuit. Under *Rincones*, Hinson's argument fails because there is no evidence that Hinson was compelled to file this lawsuit, and it was certainly not foreseeable to Fidelity that Hinson would republish the allegedly defamatory statements by filing a lawsuit when he had not suffered any damages. Moreover, the publication of a lawsuit cannot form the basis for a defamation claim. *Riley v. Zuber*, No. 01-98-01180-CV, 2001 WL 59325, at \*5 (Tex. App.—Houston [1st Dist.] Jan. 25, 2001, no pet.) (not designated for publication). And, once the lawsuit was filed, Hinson's allegations became part of the public record, and his subsequent discussion of them was the redistribution of public information, not a republication. *Id*. at \*5.

## III. Tortious Interference with Existing and Prospective Contracts

The trial court properly granted Fidelity summary judgment on Hinson's claims for tortious interference with contracts. To succeed on a tortious interference with existing contracts claim a plaintiff must prove: (1) the plaintiff had a valid contract subject to interference; (2) willful and intentional interference by the defendant; (3) the defendant's interference proximately caused the plaintiff's injury; and (4) the plaintiff incurred

actual damage or loss. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

The elements for tortious interference with prospective contracts are: (1) a reasonable probability that the plaintiff would have entered into a business relationship with a third person; (2) the defendant intentionally interfered with the relationship; (3) the defendant's conduct was independently tortious or unlawful; (4) the defendant's conduct was performed with a conscious desire to prevent the relationship from occurring or with the knowledge that the interference was certain or substantially likely to occur as a result of the conduct; (5) the defendant's conduct proximately caused the plaintiff's injury; (6) a lack of privilege or justification for the defendant's actions; and (7) the plaintiff suffered actual damage or loss. *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632-33 (Tex. App.—Fort Worth 2007, pet. denied).

Summary judgment was proper for Fidelity because (1) the tortious interference claims are based on the allegedly defamatory statements and are covered by the qualified privilege; (2) Hinson failed to provide evidence of any current contracts subject to interference; (3) Hinson failed to provide evidence of any prospective relationships subject to interference or of Fidelity's knowledge of or interference with such relationships; (4) Hinson

failed to provide sufficient evidence of damages; (5) Hinson waived numerous arguments at both the trial and appellate level; and (6) Fidelity established that it did not engage in any tortious conduct.

### A. These claims are based on the allegedly defamatory statements which are protected by the qualified privilege.

Hinson's tortious interference claims are based entirely on the allegation that Fidelity interfered with Hinson's existing and prospective contractual and business relationships by making the alleged defamatory statements. *C.R. 1:32-35* (Third Am. Pet. at ¶¶69-70, 77-78).

As established above, these statements are protected by the qualified privilege, and thus cannot serve as a basis for liability for the tortious interference claims. The Texas Supreme Court has recognized that the defenses available to defendants accused of defamation are also available when other causes of action are based on defamatory statements. Artful pleading to avoid defamation defenses is not permitted. For example, in *Nath v. Texas Children's Hospital*, the Court held that a claim for tortious interference with contracts which was based solely on the making of false statements was predicated on defamation and thus subject to defamation's one year statue of limitations. 446 S.W.3d 355, 370 (Tex. 2014). In another case, the Court held that a mental health professional's statements

were privileged as statements made in the course of a judicial proceeding, and this privilege defeated the negligence claim brought by plaintiff. *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994).

As established above, any statements made by Fidelity relating to the cancellation of the contract to CJA were privileged. *See above* at 37-40. Thus, the statements cannot be the basis of liability for tortious interference.

**B.    Hinson failed to produce any evidence of existing contracts subject to interference.**

Hinson failed to produce evidence of a valid contract subject to interference. Hinson contends he lost contracts with Betty Samota, Mack Dick, The Ranch Group, Rio Petroleum, Athletic Solutions, and Star Consultants. *Appellants' Brief* at 43. Yet, Hinson failed to produce any of these alleged contracts. Nor has he produced any evidence establishing agreements with any of the aforementioned entities. Instead, he has merely offered his own inadmissible hearsay testimony and conclusory statements alleging agreements. *See Rizkallah v. Conner*, 952 S.W.2d 580, 588 (Tex. App.—Houston [1st Dist.] 1997, no pet.) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion."); *Krishnan v. Law Office of Preston Henrishson*, 83 S.W.3d 295, 299 (Tex. App.—Corpus Christi 2002, pet. denied) (citing *Tex. Div.-Tranter v.*

*Carrozza, 876 S.W.2d 312, 314 (Tex. 1994)* ("statements of subjective belief are no more than conclusions and are not competent summary judgment evidence")).

Likewise, Hinson has not offered any evidence, beyond bald allegations, that he is an intended third-party beneficiary to the contract between Fidelity and CJA. Absent evidence establishing that Fidelity breached one of its own contracts for the purpose and effect of preventing performance of another contract to which Hinson was actually a party, the claim fails.

Finally, Hinson cannot now state that his contract with CJA is the basis for the claim of tortious interference with existing contracts. Hinson did not allege at the trial court that Fidelity interfered with this contract, and he cannot do so now. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678-79 (Tex. 1979).

Hinson failed to present a single piece of evidence establishing the existence of any contract subject to interference. As such, Hinson' claim for tortious interference with existing contracts failed as a matter of law. *See Hurlbut,* 749 at 767 (upholding summary judgment on the plaintiffs' tortious interference with existing contracts claim where plaintiffs failed to offer in evidence the contracts with which they alleged interference).

**C.** **Hinson failed to offer evidence of prospective business relationships subject to interference, or that Fidelity knew of or intentionally interfered with any relationships.**

To succeed on a claim for tortious interference, Hinson had to prove that Fidelity intentionally interfered with the formation of a prospective contract or business relationship. *See Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001). A defendant intentionally interferes if it desires to bring about the interference or if it knows the interference is certain or substantially certain to occur as a result of its conduct. *Id.* (quoting Restatement of Torts). If the defendant does not have actual knowledge of the prospective contract or business relationship, any interference cannot be intentional. *See Hill v. Heritage Res,. Inc.*, 964 S.W.2d 89, 123 (Tex. App.—El Paso 1997, pet. denied). Further, if the interference was merely an incidental result of conduct that the defendant was engaging in for another purpose the interference may be unintentional. *Bradford*, 48 S.W.3d at 757.

Hinson alleged that Fidelity made defamatory statements which caused business contacts like Louis Meers, Deborah Welch, Jim Ferguson, and Stuart Wright to stop providing client referrals to Hinson. However, Hinson offered no evidence that Fidelity knew, or even should have known, of their relationships with the named parties. Moreover, Wright, Welch and

56

Meers all testified that any decrease in referrals was the result of Hinson's lawsuit against Renfro, not Fidelity's actions. *C.R. 2:293* (Wright depo. 17); *2:196-97* (Welch depo. 10, 17)[11]; *2:265* (Meers depo. 30-31).

There is no evidence that Fidelity had any intent to interfere with Hinson's relationship with CJA, and the record demonstrates that all of Fidelity's communications with CJA involved the exercise of its contractual right to request the return of the commission payments. *C.R.* 2:*309* (a'ment at Article VIII ¶2). Further, any contention that Fidelity's termination of any new business with CJA interfered with Hinson's contracts fails because (1) the relationship between CJA and Hinson is ongoing and (2) Fidelity was merely exercising its rights under the Master Services Agreement and (3) the termination of Fidelity's relationship with CJA predates the alleged statements by months. *C.R. 2:130, 136* (Ankner depo. 14, 110); *2:84, 117, 121* (Hinson 110-111, 169-170, 206); *2:304-05* (a'ment at Article IV).

Hinson's allegations that Fidelity interfered with its own prospective relations with him were properly disregarded because Fidelity cannot tortiously interfere with its own prospective contracts; neither can Smith as

---

[11] Welch also testified that she did not refer clients to Renfro prior to the filing of the lawsuit because she "felt like he was sometimes more interested in a sales commission than what was best for the client." *C.R. 2:196* (Welch depo. 17).

an employee of Fidelity. *See Morgan Stanley & Co. v. Texas Oil Co.*, 958 S.W.2d 178, 179 (Tex. 1997) (applying requirement that party must be a stranger to a prospective contract to tortiously interfere with it).

**D. Hinson failed to provide sufficient evidence of any damages.**

Both tortious interference claims required proof of damages. *Prudential*, 29 S.W.3d at 77; *Astoria Indus.*, 223 S.W.3d at 632-33. As discussed above, Hinson failed to provide sufficient evidence of damages to avoid summary judgment. *See above,* at 40-51.

**E. Hinson waived arguments both at the trial court and on appeal.**

In the traditional motion for summary judgment, Fidelity argued that it had a defense of justification to the tortious interference claim. *C.R. 2:44-46*. On appeal, Hinson failed to adequately brief this defense. Hinson's argument addressing justification is one sentence long, simply says Fidelity failed to show a contractual right regarding justification, and contains no legal or record citations without any attempt to demonstrate justification was an improper basis for summary judgment. This conclusory sentence waives the argument. *See above*, at 38-39 (discussing briefing waiver).

Because justification is grounds upon which summary judgment could have been granted and Hinson waived the right to appeal justification, the holding of the trial court must be upheld. *Rangel v. Progressive County Mut. Ins. Co.*, 333 S.W.3d 265, 269-70 (Tex. App.—El Paso 2010, review denied) ("When the appellant does not expressly challenge every ground by specific points of error, or a broad issue, the summary judgment must be affirmed if there is an unchallenged ground upon which the trial court could have based the summary judgment.").

Additionally, Hinson failed to adequately brief the tortious interference with prospective contracts claim below, and failed to preserve several arguments raised for the first time on appeal. Hinson's response to the interference with prospective contracts was a single paragraph of four sentences which did not contain a single citation to any record evidence. *C.R. 2:472-73.* Hinson's mere recitation of a possible legal theory, without any evidence establishing that Fidelity breached one of its own contracts for the purpose and effect of preventing performance of another prospective contract, did not establish the existence of a material fact. This response in no way established the existence of a material fact relating to any prospective relationships, and Hinson offered no evidence to rebut the

uncontroverted summary judgment evidence that established that Fidelity did not intentionally interfere with any of Hinson's prospective business.

On appeal, Hinson, for the first time, cites to record evidence to support his contention that there was a material question of fact relating to prospective business and argues that Fidelity failed to prove the absence of an intent to interfere. It is improper to ask this court to consider evidence and arguments Hinson did not bring to the attention of the trial court. *City of Houston,* 589 S.W.2d at 678-79. Even if the Court were to consider Hinson's argument, he simply lists factors he argues are evidence of an intent to interfere without any attempt to explain how this evidence shows Fidelity had knowledge of or wanted to interfere with Hinson's prospective business.

Hinson's argument boils down to his desire for Fidelity to do the impossible: prove the non-existence of any prospective business. Clearly, this is not what is required for summary judgment. Fidelity properly established that the evidence shows they did not interfere, legally or factually, with Hinson's prospective relationships with any of the parties they identified. The burden then shifted to Hinson to show the existence of a material fact, which he failed to do.

**F.     The record evidence showed that Fidelity did not engage in any tortious conduct.**

Hinson's tortious interference with prospective contract claim also failed because Fidelity's alleged conduct was not independently tortious or unlawful.  Fidelity's conduct is only independently tortious if it would be actionable under a recognized tort.  *Tex. Integrated Conveyor Sys.,* 300 S.W.3d at 379.  However, as demonstrated to the trial court below and in this brief, neither Fidelity nor Smith's alleged actions form the basis of an actionable tort.

## IV.   Conspiracy

Hinson has waived his appeal of the judgment on the conspiracy claim.  In his argument on conspiracy, Hinson cites to a single case, *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005), for the sole purpose of identifying the elements of conspiracy.  Significantly, Hinson fails to provide any substantive analysis or to address the key holding of *Tri*, where the Supreme Court held, unequivocally, that civil conspiracy requires evidence that the members of the conspiracy had a "meeting of the minds to accomplish an unlawful purpose or to accomplish a lawful purpose by an unlawful means."  *Id.* at 560.  Because Hinson failed to provide any further citations and provides only a brief conclusory argument, the decision of the

61

trial court must be upheld. *Olsen*, 347 S.W.3d at 884 ("Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint.").

Moreover, summary judgment was properly granted to Fidelity because Hinson could not establish a question of fact with regard to any element of a conspiracy claim. In order to prove conspiracy a plaintiff must establish that: (1) defendant was a member of a combination of two or more persons; (2) the object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) the members had a meeting of the minds on the object or course of action; (4) one of the members committed an unlawful, overt act to further the object or course of action; and (5) the plaintiff suffered injury as a proximate result of the wrongful act. *Tri,* 162 S.W.3d at 556. Additionally, conspiracy is a derivative claim and a plaintiff must prove a defendant is liable for some underlying intentional tort. *Wohlstein v. Aliezer*, 321 S.W.3d 765, 775 (Tex. App.—Houston [14th Dist.] 2010, no pet.). For a civil conspiracy to arise, each party must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement. *Firestone Steel Prods. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996).

Hinson failed to identify any evidence that Fidelity or Smith joined with any others with the intent to commit a wrongful act. Hinson tries to distract from his inability to meet the standard set forth by the Supreme Court in *Tri* by analyzing the elements of conspiracy independent of each other. In this regard, Hinson argues that the common objective of the alleged conspiracy was the publishing of the statement that Hinson forged Renfro's signature and the Release. Again, Hinson does not cite to record evidence or to any legal support, but to the pleadings before the trial court. *Appellants' Brief* at 45-47.

Hinson completely fails to explain how the Release shows a meeting of the minds to accomplish an unlawful purpose or lawful purpose by an unlawful means. Although Hinson cites to deposition testimony, he makes absolutely no attempt to explain what is in the cited testimony or how the cited testimony is relevant to the argument he is attempting to make.

Moreover, the uncontroverted record evidence is that the Release was the result of good faith negotiations between Fidelity, Renfro, and Star. *See above*, at 18. Hinson incorrectly states that the Release protects only Fidelity, when in fact Renfro and Star released all claims relating to the purchase of the annuity as to Fidelity, CJA, Hinson, and PAG. *Id.*

Finally, Hinson failed to put forth any evidence of liability for an underlying tort. As demonstrated to the trial court below and in this brief, Fidelity's alleged actions form the basis of an actionable tort.

## V. Fiduciary Duty

Hinson has waived his right to argue that the court erred in granting summary judgment on the fiduciary duty claim by failing to adequately brief it. Hinson's argument on fiduciary duty is three sentences long, and contains no legal citations or substantive analysis. *Olsen*, 347 S.W.3d at 884 ("Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint.").

Moreover, the trial court correctly granted summary judgment on this claim because Fidelity owed no fiduciary duty to Hinson. There are two circumstances under which a fiduciary duty exists. First, a fiduciary duty can arise as a matter of law through formal relationships such as attorneys and their clients, partners, and corporate officers. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). There is no evidence of a formal relationship between Hinson and Fidelity. *Casteel v. Crown Life Ins. Co.,* 3 S.W.3d 582, 590 (Tex. App.—Austin 1997, rev'd on other grounds, 22 S.W.3d 378 (Tex. 2000)) (rejecting the plaintiff's claim for breach of a fiduciary duty against the insurance company for which he was an agent,

finding that while the agent has a fiduciary duty to the company, "no Texas case has held that a principal owes a fiduciary duty to an agent"); *National Am. Ins. Co. v. Thompson,* No. 06-00-00111-CV, 2001 WL 521913, at \*5 (Tex. App.—Texarkana May 17, 2001, pet. denied) (noting that while an agent owes a fiduciary duty to his principal, "[t]he converse does not hold true").

Second, a fiduciary duty can arise out of an informal relationship. *Crim. Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) (superseded by statute on other grounds). To prove an informal fiduciary relationship, the plaintiff must establish dealings between the plaintiff and the fiduciary continuing long enough to justify the plaintiff's reliance on the fiduciary to act in the plaintiff's best interest. *Carr v. Weiss*, 984 S.W.2d 753, 765 (Tex. App.—Amarillo 1999, pet. denied). Additionally for there to be a fiduciary relationship in a business transaction the "requisite special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *E.R. Dupuis Concrete Co. v. Penn Mut. Life Ins. Co.*, 137 S.W.3d 311, 318 (Tex. App—Beaumont 2004, no pet.); *Meyer*, 167 S.W.3d at 628. There must be evidence that the plaintiff relied on the fiduciary for moral, financial, or personal support or guidance. *See, e.g. Lee v. Hasson*, 286

65

S.W.3d 1, 18-19 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding that defendant became plaintiff's fiduciary when plaintiff shared private medical and financial information and relied on defendant for personal and moral support).

There is no evidence to support a finding of a confidential relationship. There is no evidence that Hinson relied on the support and guidance of Fidelity, and Hinson testified in his deposition that *he never had any communication with Fidelity*, including Smith. *C.R. 2:74-75* (Hinson depo. 24; 26-27). Hinson claims that Fidelity's negotiation of the release with Renfro created a fiduciary duty, without any explanation as to how this relationship was established prior to and separate from the Release, as the law requires. The sheer absurdity of Hinson's position is portrayed in his argument that Fidelity should have negotiated with Renfro and Star to obtain a release for all of Hinson's dealings with Renfro that are wholly unrelated to Fidelity and about which Fidelity could not have had knowledge because Hinson never spoke to anyone at Fidelity. *Id.*

Even if there was any evidence of a fiduciary relationship, Hinson produced no evidence that there was a breach of any duty. In his deposition, Hinson explained his fiduciary duty claim was based on Fidelity's decision to cancel the annuity, potentially exposing Hinson to

66

liability despite his inclusion in the Release. *C.R. 2:120 (Hinson depo. 199-200).* As discussed above, Fidelity simply did what it was required to do under the contractual terms of the annuity—honor Renfro's request to return the contract value—and permitted to do under the plain terms of Hinson's Commission Agreement with CJA—charge back commissions. In obtaining the Release, Fidelity provided Hinson with protection from all claims relating to the issuance of the annuity itself. *See above*, at 18.

## VI. Evidentiary Motions

### A. Hinson has made no showing of harm relating to the exclusion of experts or summary judgment evidence.

To show that the trial court abused its discretion in excluding evidence, a complaining party has the burden of demonstrating that: (1) the trial court erred in excluding the evidence; (2) the erroneously excluded evidence was controlling on a material issue dispositive of the case and was not cumulative; and (3) the error probably caused rendition of an improper judgment in the case. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Therefore, even if the trial court erred, to warrant reversal, an appellant "must show that the trial court's erroneous admission or exclusion of evidence was harmful—that it was calculated to cause and probably did cause the rendition of an improper judgment." Tex. R. App. P. 44.1;

67

*Doncaster v. Hernaiz*, 161 S.W.3d 594, 601 (Tex. App.—San Antonio 2005, no pet.).

Hinson has not even attempted to meet his burden; he has failed to argue that any alleged error caused the rendition of an improper judgment. By failing to show that the exclusions changed the outcome, Hinson has waived the right to ask for any relief relating to these two motions. *McCarthy v. Padre Beach Homes, Inc.*, No. 13-01-846-CV, 2003 WL 22025858, at * 5 (Tex. App.—Corpus Christi Aug. 19, 2003, no pet.) ("Appellants have provided no substantive analysis in their argument showing harm, nor any legal authority in support of their argument. The issue is waived.").

**B.  Hinson fails to prove that the trial court abused its discretion by excluding the expert testimony of James Ferguson and Stuart Wright.**

A trial court has broad discretion in determining whether expert testimony is admissible, and its exclusion of expert testimony can be reversed only if that discretion is abused. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). Because the trial court did not specify the ground on which it excluded Hinson's experts, Ferguson and Wright, this Court must affirm the trial court's ruling if any ground is meritorious. *Id*.

Hinson makes no attempt at explaining how the trial court in any way abused its discretion in excluding Ferguson and Wright. Because neither has a qualified expert opinion on alleged damages nor a qualified expert opinion on Fidelity's conduct, their testimony was not relevant to summary judgment and would not have helped the trier of fact understand the evidence or determine a fact in issue.[12]

### 1. Neither Ferguson nor Wright have qualified expert opinions on alleged damages suffered by Hinson.

Neither expert has a qualified expert opinion on damages allegedly suffered by Hinson. In his Brief, Hinson states: "Ferguson testified that his opinion was that actual damages are $800,000-$1,200,000, and Wright testified that—while the forgery allegation is pending—he will not refer business to Hinson and Hinson's product will likely not be successful. Thus, Ferguson and Wright offer expert opinions." *Appellants' Brief* at 54. This testimony does not represent qualified expert opinions on damages— the opinions are based wholly in speculation.

---

[12] Contrary to Hinson's misconceptions, neither expert witness has personal knowledge of the facts underlying the lawsuit. *See above*, at 24-25. All of Wright's knowledge of the lawsuit came from Hinson and his attorney, Bill Ramey. *See above,* at 24. Ferguson testified that he has no independent knowledge of the underlying facts in the lawsuit—Defendant Frank Renfro's certified public accountant told Ferguson about the lawsuit. *See above*, at 24.25.

Wright testified that he has no knowledge of any actual damages suffered by Hinson and no opinions as to the amount of damages he suffered. *C.R. 2:293-94* (Wright depo. 17-18). Wright said that he would not send clients to Hinson, but also testified that he could not identify any clients lost by Hinson as a result of the lawsuit and did not estimate a damages amount. *C.R. 2:292, 293* (Wright depo. 5, 17). Therefore, Wright's own testimony indicates that he does not have an expert opinion to offer on alleged damages.

Similarly, Ferguson testified that he did not perform any analysis or complete any studies—nor obtain information from Hinson—prior to stating an opinion on alleged damages suffered by Hinson. *C.R. 2:484* (Ferguson depo. 26). Ferguson acknowledged that his testimony on what damages Hinson will suffer is speculation. *C.R. 2:483* (Ferguson depo. 31). Ferguson testified that his damages estimate is based on nothing more than his intention not to refer business to Hinson, and his belief that he might have $800,000 to $1.2 million in insurance business (not commissions) to refer to Hinson but for the forgery allegations. *C.R. 2:484* (Ferguson depo. 26). Moreover, to prove damages Hinson must show lost net profits, not lost commissions, much less lost business. *Kellmann*, 332 S.W.3d at 684

("The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits.").

The only opinion as to damages that Hinson's proffered experts can provide is that they did not intend to personally refer clients to Hinson while the forgery allegation was pending. *C.R. 1:167*. Any testimony about these intentions is not expert testimony based on specialized knowledge or a reliable foundation as required by Texas Rule of Evidence 702. Furthermore, neither expert used any type of methodology to form these opinions regarding whether they intended to refer business to Hinson. Neither expert made any attempt to review Hinson's financial records to determine whether he actually lost business. Instead they simply admitted they were speculating as to potential future loss. *C.R. 2:258* (Ferguson depo. 20); *291* (Wright depo. 5) (testifying that he cannot identify any clients Hinson lost as a result of the allegations in the lawsuit).

Similarly, Ferguson's experience as the owner of a business publicly investigated for tax fraud does not make him an expert with scientific, technical or specialized knowledge. This testimony is subjective and grounded in Ferguson's personal, singular experience that is neither relevant nor similar to the instant matter. Ferguson himself acknowledged this fact, noting that his experience with a public federal investigation and

71

trial was very different from Hinson's situation.  *C.R. 1:139* (Ferguson depo. 44)

Finally, both Ferguson and Wright testified that they have no basis from which to testify as to the value or loss of the pension product developed by Hinson.  *C.R. 1:151* (Wright depo. 26); *1:137* (Ferguson depo. 34-35).  Both testified that they did not know if the product would experience success in the absence of the forgery allegations.  *C.R. 1:151* (Wright depo. 26); *1:137* (Ferguson depo. 34-35).  Ferguson testified that he had not discussed the product with Hinson in "a number of months" and that he did not know about meetings Hinson had with professional organizations to set up the launch of the product.  C.R. 1:134 (Ferguson depo. 24).  Their testimony related to this topic lacks reliable foundation and is not probative.

### 2. Neither Ferguson nor Wright have qualified expert opinions on Appellees' conduct.

Hinson must prove that Fidelity acted with malice to establish business disparagement and to defeat Fidelity's claim of a qualified privilege.  As discussed above, the question of malice is one of subjective intent, s*ee above,* at 31-37, and thus general objective information and opinions lacking foundation are irrelevant and the proposed testimony of

Ferguson and Wright is of no value to a jury. Moreover, their testimony clearly indicates that they have no opinion on the question of malice and cannot "assist the jury with understanding the relevant context and facts." *See Appellants' Brief* at 62; *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (holding that an expert witness should be excluded "[w]hen the jury is equally competent to form an opinion about the ultimate fact issues"). Both Ferguson and Wright testified that they cannot offer any opinions on the conduct of Fidelity. *C.R. 1:149-50* (Wright depo. 21-22); *1:136* (Ferguson depo. 30). Ferguson testified that he does not know who alleged that Hinson committed forgery, he has no opinion on the intentions of Fidelity, and he does not know whether they acted with malice. *C.R. 1:135-36* (Ferguson depo. 28, 30). Similarly, Wright testified that he has no knowledge of the statements allegedly made by Fidelity, he cannot offer testimony regarding any intentions, he does not even have a basic understanding of the obligations that Fidelity operated under, and he is unable to offer an opinion regarding the conduct of Fidelity. *C.R. 1:149* (Wright depo. 20-21).

73

**C. Hinson fails to prove that the trial court abused its discretion by striking Hinson's summary judgment evidence.**

The exclusion of summary judgment evidence is a matter within the trial court's discretion and will not be overturned absent an abuse of discretion. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Portions of Hinson's deposition testimony were hearsay evidence and thus inadmissible. *See Maxwell v. Willis*, 316 S.W.3d 680, 686 (Tex. App.—Eastland 2010, no pet.) (on summary judgment, trial court was not permitted to consider deposition testimony of student because testimony was hearsay); *see also Ho v. Univ. of Texas at Arlington,* 984 S.W.2d 672, 680 (Tex. App.—Amarillo 1998, pet. denied) (trial court not permitted to consider hearsay evidence in its ruling on motion for summary judgment). Moreover, Hinson's testimony was conclusory and failed to support the assertion that he had contracts. Therefore, such statements were incompetent as summary judgment evidence. *See Rizkallah*, 952 S.W.2d at 588 (conclusory statement lacks underlying facts to support conclusion); *see also Krishnan*, 83 S.W.3d at 299 (statements of subjective belief are no more than conclusions and are not competent summary judgment evidence).

74

Hinson's sole argument with regard to summary judgment evidence is that its evidence should not have been stricken because Fidelity introduced similar evidence in its summary judgment motions. *Appellants' Brief* at 62-66. Contrary to Hinson's arguments, Fidelity did not offer hearsay evidence in support of its Traditional Motion for Summary Judgment.[13] Additionally, Hinson never objected to the summary judgment evidence offered by Fidelity, nor did he identify any hearsay testimony proffered by Fidelity for the truth of the matter asserted. Finally, the prohibition on "opening the door by referencing a matter and then complaining when the opposing party references the same subject matter" is founded on the rationale that a party cannot claim jury prejudice when it introduced to the jury the type of evidence it claims was prejudicial. *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 841 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd

---

[13] Hinson mischaracterizes Fidelity's summary judgment evidence. Most of the "related or similar" testimony that Hinson contends was introduced was only contained within the deposition transcript pages that included testimony that Fidelity cited. The few instances in which Fidelity did cite the testimony included on the chart, it was for the sole purpose of identifying Hinson's allegations and explaining that Hinson's claims could not survive the summary judgment. *See, e.g., C.R. 2:43* (traditional motion). None of the testimony referenced by Hinson was relied upon by Fidelity for the truth of the matter asserted in the testimony.

n.r.e.).  This rationale is unrelated to the granting of summary judgment; there is no possibility of jury prejudice.

Hinson has failed to demonstrate that the trial court abused its discretion when granting Fidelity's motion to exclude his inadmissible evidence.

## CONCLUSION AND PRAYER FOR RELIEF

Fidelity and Smith ask that the Court affirm the judgment of the trial court.  Fidelity and Smith also ask for such other additional relief to which they are entitled.

Date:  February 27, 2015

Respectfully Submitted,

DENTONS US LLP

/s/ Gene R. Besen
Gene R. Besen
State Bar No. 24045491
Kym Davis Rogers
State Bar No. 00796442
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201
Telephone:  (214) 259-0900
Facsimile:   (214) 259-0910
Email: gene.besen@dentons.com

Ralph F. Meyer
State Bar No. 13994300
Brian Miller
State Bar No. 24002607
ROYSTON, RAYZOR, VICKERY &
WILLIAMS, L.L.P.
1300 Frost Bank Building
802 N. Carancahua
Corpus Christi, Texas 78401-0021
Telephone: (361) 884-8808
Facsimile: (361) 884-7261
Email: Ralph.meyer@roystonlaw.com

**ATTORNEYS FOR APPELLEES FIDELITY SECURITY LIFE INSURANCE COMPANY AND DAVID SMITH**

77

## CERTIFICATE OF WORD-COUNT COMPLIANCE

I certify that this document complies with Rule of Appellate Procedure 9.4. Excluding the portions listed in Rule 9.4(i)(1), and according to the word count of the computer program used, this document contains 14,938 words.

/s/ Gene R. Besen
Gene R. Besen

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was served on

February 27, 2015 on the following using the e-filing system and via email

to the addresses indicated below:

William P. Ramey, III
Harry Laxton
Ramey & Browning, PLLC
5020 Montrose Blvd., Suite 750
Houston, TX 77006
Fax (832) 900-4941
wramey@rameybrowning.com
bwilliams@rameybrowning.com
hlaxton@rameybrowning.com

C. M. Henkel III
Fritz, Byrne, Head & Harrison, PLLC
500 N. Shoreline, Suite 901
Corpus Christi, TX 78401
Fax (361) 888-9149
skip@cmhenkel.com

*Attorneys for appellants Pension Advisory*
*Group, Inc., and Paul D. Hinson*

/s/ Gene R. Besen
Gene R. Besen